[Civ. No. 9.   Fourth Appellate District.—November 14, 1929.]

JOHN A. ECK COMPANY (a Corporation), Appellant, v. COACHELLA VALLEY ONION GROWERS' ASSOCIATION (a Corporation), Respondent.

Hickcox & Thomson and A. Heber Winder for Appellant.

H. L. Carnahan, Harry Povey and Walter S. Barrette for Respondent.

SLOANE, P. J.—This action was brought by the appellant, an Illinois corporation, engaged in a general fruit and brokerage business, against the defendant, a corporation organized under the laws of California, and engaged in the production of onions in the county of Riverside, state of California.

The action was brought to recover from the defendant damages for alleged loss of profits arising from breach of contracts purported to have been entered into between the plaintiff and defendant corporation. The appeal is by the plaintiff from a judgment in favor of defendant and denying plaintiff the relief asked for.

The alleged contracts in question purport to have been entered into with the plaintiff by one W. L. Benchley, doing business under the name of Benchley Fruit Company, in behalf of and as the alleged authorized agent of defendant company. The whole controversy rests upon the authority of Benchley to obligate the defendant by these contracts. The agency, if it existed, was created by the following agreement:

"Coachella Valley Onion Growers Association — Benchley Fruit Company.

"This agreement, made and entered into this 3rd day of March, 1923, by and between the Coachella Valley Onion Growers Association, a corporation duly organized and existing under the laws of the State of California, with its principal place of business in Coachella, County of Riverside, State of California, said association hereinafter called the party of the first part, and The Benchley Fruit Company, with its principal office in the City of Fullerton, California, said company hereinafter called the party of the second part.

"Witnesseth:

"Whereas, the Board of Directors of the Coachella Valley Onion Growers Association on March 2nd, 1923, adopted the following resolution, to-wit:

" 'Be It Resolved: by the Board of Directors of the Coachella Valley Onion Growers Association, that the association accept the proposition of the Benchley Fruit Company, to-wit: That the Benchley Fruit Company agrees to market and sell as agent for the Coachella Valley Onion Growers Association fifty (50) car loads of No. 1 Yellow Bermuda onions at One and 50/100 ($1.50) Dollars per crate net f. o. b. loading point, Coachella Valley; That Seventy-five (75c) cents per crate is to be deposited with a bank, or banks in escrow upon the signing of a contract between the Coachella Valley Onion Growers Association and the Benchley Fruit Company and a guarantee of a bank or banks on the balance in the sum of Seventy-five (75c) cents per crate at the time of delivery of said onions f. o. b. loading points in the Coachella Valley; shipment of said onions to be made at the rate of ten (10) cars per week during the onion season.'

"And whereas, the party of the second part has agreed to carry out the terms of the said resolution,

"Now therefore, the party of the first part having adopted the said resolution at a meeting of the Board of Directors of the Coachella Valley Onion Growers Association held on March 2, 1923, authorizing the entering into a contract with a party of the second part, and authorizing the party of the second part to market the 1923 onion crop of the party of the first part, which said resolution is hereby made a part of this contract, the following supplementary clauses are agreed upon by both parties:

"During the life of this contract the party of the first part agrees to market through the agency of the party of the second part all of the onions produced and controlled by it. If any sales are made otherwise than through the agency of the party of the second part, said second party shall nevertheless be entitled to receive the same charge per crate that would be due if marketed through their agency.

"The party of the first part reserves the right to decide when or in what amounts to ship, and with the exception of

cars sold at auction, to decide prior to sale the price that it is willing to accept.

"It is understood that in the shipping, marketing and the distribution of the crop, the party of the second part acts as agent only, and shall not be liable for any transportation charges nor for any loss resulting from the shipping, marketing or distribution of the crop.

"The party of the second part agrees to use its best efforts to sell and dispose of the crop or crops covered by this contract, but it is expressly understood that in so doing it acts as agent only of the party of the first part, and assumes no responsibility or financial liability therefor further than it agrees to turn over to the party of the first part the cash proceeds of all sales as soon as received, retaining their brokerage for their services as hereinafter provided.

"It is further agreed that the party of the first part shall pay all expenses and costs incidental to the harvesting, packing, inspecting, loading and marketing of the crop. Party of the second part shall do all the clerical work connected with the collection of the proceeds, at their own expense. All collection charges and exchange, if any, shall be paid by the party of the first part.

"Party of the second part agrees to place a competent employee at the loading station during the shipping season, at their own expense, to assist in the billing and routing of the cars, and to aid the association in developing membership.

"It is understood and agreed that the party of the second part will refund to the party of the first part Seven ($7.00) Dollars per car out of their Five (5c) cents per crate as hereinafter specified on the Fifty (50) cars sold as in the above resolution provided, said refund to be made at the time remittance is made for the said onions.

"It is understood and agreed that the party of the second part as agents, will purchase for the party of the first part the necessary crates for the packing of said onions, and said party of the second part agrees to guarantee the payment thereof; the party of the second part to retain from the net proceeds of the sale of the first onions delivered, the purchase price of said crates and to render an accounting of the same to the party of the first part, provided how-

ever, the party of the second part agrees to allow the party of the first part the necessary harvesting money.

"The party of the second part is hereby authorized to retain from the net proceeds of all sales made by it the sum of five (5) cents per crate, said sum to be their full compensation for the services rendered. The balance of the proceeds to be remitted at once to the party of the first part; provided however, that any indebtedness of the party of the first part to the party of the second part may be deducted from any returns received by it.

"The party of the first part shall have the right at any time to inspect the books and accounts of the party of the second part, in so far as said accounts may relate to the business covered by this contract.

"It is agreed that in so far as possible, the marketing of this crop shall be done through co-operative agencies, such as the Federated Fruit and Vegetable Growers.

"COACHELLA VALLEY ONION GROWERS ASSOCIATION,
"Party of the first part,
"By BEN L. CLARY, its president.
"By CHAS. B. JONES, its secretary.
"BENCHLEY FRUIT COMPANY,
"Party of the second part.
"By W. L. BENCHLEY, its president."

The foregoing agreement undoubtedly created a sales agency, whereby W. L. Benchley, as the Benchley Fruit Company, was empowered to enter into contracts with the plaintiffs, or other brokers in that line of business, for the disposal of the defendant company's 1923 onion crop. But this agency agreement, while it created the relation of principal and agent, also put its express limitations upon the agent's powers.

As to the first fifty carloads of onions, a sales price of $1.50 per crate net, f. o. b. at loading point, Coachella Valley, is required, with seventy-five cents per crate of the purchase money to be deposited upon the execution of the agency contract and a bank guarantee to be given on the remaining seventy-five cents per crate at the date of delivery of the onions; any subsequent sales are to be made subject to the right of the onion company to decide when and in what amounts to ship, and with the exception of sales

made at auction, to decide prior to the sale the price the onion company was willing to accept.

Under this sales agreement Benchley proceeded to execute, with the plaintiff corporation, the two contracts in question, which are the basis of this action.

One is of date March 12, 1923, shown in the record as Plaintiff's Exhibit "B," wherein it is recited that the Benchley Fruit Company, acting as agent for the Coachella Valley Onion Growers' Association, as party of the first part, contracts to sell to the plaintiff, John A. Eck Company, as party of the second part, fifty carloads of onions, at a guaranteed price of seventy-five cents per crate, f. o. b. Coachella, California, the party of the second part guaranteeing to the party of the first part an average of seventy-five cents per crate, and that any overage that shall be received on marketing the onions shall be the money of the party of the first part, after deducting seven per cent commission on the gross sale of each car. This contract also provides that the shipping dates on the onions shall be from the first shipments from Coachella district, right through the shipping season, at not to exceed a maximum of five cars, or less than a minimum of three cars per day, weather conditions, crop maturity and railroad facilities permitting, and that the party of the second part will have free and unrestricted right to sell all these onions through their Chicago office "as they roll," and that they are expected to get the prevailing market price for Coachella Valley onions at the time the sale is made, they, however, to use their own judgment and discretion in making these sales, and are free and are authorized to handle to the best of their judgment and ability.

The second contract, which is of date March 14, 1923, contains the same recitals as to parties as the first, and is for the sale to the plaintiff corporation of an additional fifty carloads of Coachella onions at a guaranteed price averaging seventy-five cents per crate, and all additional amounts received from the marketing of the onions in excess of seventy-five cents per crate, after deducting the agreed commission of seven per cent to be paid to the party of the first part; the shipping conditions are practically the same in both contracts, commencing with the first shipments from the Coachella district, and continuing it not to exceed

a maximum of five cars daily, with a minimum of three cars per day.

Neither of these contracts is executed in the name of the Coachella Valley Onion Growers' Association, but they are signed, respectively, "Benchley Fruit Company, per W. L. Benchley; John A. Eck Company, per H. A. Eck, Sec'y."

It may be reasonably questioned, under the circumstances of the execution of these two contracts, if they were intended to create an original and primary contractual liability between the Coachella Valley Onion Growers' Association and the John A. Eck Company.

However that may be, it clearly appears that the Benchley Company intended by these contracts to bind its principal, the Coachella Valley Onion Growers' Association, and it is also obvious that each of the agreements contained material provisions, not only in excess of but in direct violation of limitations placed on the agent's powers under the sales agency contract. The sales agency agreement expressly stipulates a sales price of $1.50 per crate on the first consignment of fifty carloads of onions, and as to all further sales reserves to the onion company the right to determine in advance the sales price it is willing to accept, and when and in what amounts shipments shall be made.

It further appears from the record that the plaintiff corporation, before or at the time the sales contracts were entered into, had before it the sales agency agreement under which the Benchley Company was purporting to act.

The sales contracts contain a number of provisions with reference to escrows of amounts to be advanced on the purchase price of the onions and other conditions which, while not directly provided for in the agency agreement with the Benchley Company, may be said to come within the incidental and implied authority of an agent, but there can be no question that the deviation from the stipulated price at which the product was to be sold, and the time and quantity in which the onions were to be shipped, unless subsequently ratified by the principal, justified the repudiation of these contracts when brought to the attention of the defendant corporation.

The trial court finds, in effect, that the contracts in question sued on here were not enforceable against defendant.

The only remaining question is as to whether the defendant company, by its conduct subsequent to the execution of these contracts, ratified the unauthorized acts of its agents or is estopped from disputing the agent's authority.

It is contended by appellant that there was unreasonable and unnecessary delay on the part of the respondent in repudiating the sales contracts made by the Benchley Company. The contracts were executed, respectively, on the 12th and 14th of March, 1923. The respondents repudiated these contracts and refused to perform under them on the twenty-third day of April, 1923. There is no evidence that respondent had any actual knowledge of the terms and conditions of these contracts prior to that date. There is testimony in the record that on or about March 20th, in a telephone conversation beween one Webster, connected with the Benchley Company, and a Mr. Kyle, assistant secretary of the defendant company, Kyle was informed that Mr. Benchley had made a very advantageous contract with the plaintiff company. It is not claimed that this was more than a casual conversation, or that any details of the contract were given. Benjamin L. Cleary, president of the defendant corporation, testified that at no time prior to April 23, 1923, had his company received any notice or information concerning the terms of the contracts from either Benchley or the plaintiff. He admits that about the middle of April these contracts were referred to at a meeting of the board of directors, but that the wording was not indicated, and he does not think the name of Eck was mentioned. Charles B. Jones, secretary of the defendant company testified: "We were not informed of contracts until receipt of telegram from plaintiff April 23d, and that no contract with plaintiff was mentioned on April 16th in the conversation between Benchley and the board of directors."

We are satisfied that up to the time of the repudiation of these contracts with the plaintiff corporation the defendants were in the possession of no actual knowledge of the terms of the contracts that had been entered into by its agent which indicated unnecessary delay or other elements of estoppel to repudiate liability thereunder.

Was respondent in the possession of such imputed knowledge arising from the fact that the Benchley Company was its agent for effecting a sale of this onion crop

as to constitute notice of the contents of the agreements entered into in excess and in violation of the terms of such agency? The general rule is well settled that the knowledge of the agent, in the course of his agency, is the knowledge of the principal, but we are satisfied that this rule will not apply to the provisions of a contract entered into by the agent beyond the scope of his employment.

This limitation is laid down in 1 Cal. Jur., page 849, section 126, as follows: "Knowledge of the agent is not knowledge of the principal as to matters not within the scope of the agent's authority. Thus, where the agency is special, rather than general, the principal is not bound by the knowledge of the agent as to acts outside the scope of his authority. The doctrine manifestly cannot be maintained that the principal, if he has knowledge of the exercise by the agent of certain powers, is bound by the act of the agent, and that he must be held to have such knowledge from the fact that the agent knows of it himself. Such doctrine would place it within the power of an agent to bind the principal to any course of conduct, however foreign or obnoxious to the authority actually conferred." (*Westerfield* v. *New York Life Ins. Co.*, 129 Cal. 68, 79 [58 Pac. 92, 61 Pac. 667]; *Raleigh* v. *Lee*, 26 Cal. App. 229 [146 Pac. 696].)

The authorities cited by appellant are in support of the doctrine of imputed notice, but no further than its application to matters within the knowledge of the agent transpiring in the course of his agency. (*Shamlian* v. *Wells*, 197 Cal. 716 [242 Pac. 483].)

When an actual agency exists and the principal has knowledge that the agent has transcended his authority, the liability of the principal to be held to a ratification of the unauthorized act by acquiescence is much greater than it would be in a case where an utter stranger had assumed to act as agent without authority. But this rule would only apply in case of actual knowledge or notice of the agent's unauthorized act.

Moreover, in this case the evidence discloses that the plaintiff corporation was informed as to the limitations on the power of the Benchley Company to contract, and with this knowledge in their possession ordinary prudence and diligence would call for prompt action on their part to

obtain some confirmation of the agent's unauthorized acts before relying upon their acceptance by the principal.

The finding of the court that the contracts sued on were not the contracts of the defendant is supported by the evidence. The other findings complained of by the appellant follow necessarily the nonexistence of an enforceable contractual relation.

The judgment is affirmed.

Barnard, J., concurred.

Marks, J., deeming himself disqualified in the foregoing case, did not join in the consideration of the decision.